IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MARVIN DALLAS LYNCH, #214178,   )
 )
     Petitioner,   )
 )
v.   )   CIVIL ACTION NO. 3:11-CV-774-WHA
 )
WILLIE THOMAS, *et al.*,   )
 )
     Respondents.   )

## RECOMMENDATION OF THE MAGISTRATE JUDGE[1]

## I.  INTRODUCTION

Marvin Dallas Lynch ["Lynch"], a state inmate, filed this 28 U.S.C. § 2254 petition for habeas corpus relief on September 16, 2011.[2]  In this petition, Lynch challenges convictions for reckless endangerment, first degree robbery and second degree theft of property imposed upon him by the Circuit Court of Chambers County, Alabama on November 4, 2008.

## II.  PROCEDURAL HISTORY

On April 23, 2008, law enforcement officials arrested Lynch on charges related to

---

[1] All exhibits and accompanying page numbers referenced herein are those assigned by this court in the docketing process.

[2] The law is well settled that a pro se inmate's petition is deemed filed the date it is delivered to prison officials for mailing.  *Houston v. Lack*, 487 U.S. 266, 271-72 (1988); *Adams v. United States*, 173 F.3d 1339, 1340-41 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780 (11th Cir. 1993).  The record indicates that Lynch submitted the petition for mailing on September 16, 2011.  *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 15.  In light of the foregoing and for purposes of the proceedings herein, the court considers September 16, 2011 as the date of filing.

the convictions challenged in this habeas action and transported him to the Chambers County Sheriff's Department.  Law enforcement officials sought to conduct an interview of Lynch and advised of him *Miranda* rights.  After Lynch verbally acknowledged his understanding of these rights and waived such rights, he made an initial statement denying involvement in the actions made the basis of the charges lodged against him.  A few days later, during his confinement in the Chambers County Jail, Lynch provided a second statement to investigators.  Prior to obtaining this statement, law enforcement officials again advised Lynch of his *Miranda* rights.  Lynch acknowledged his understanding of these rights and signed a waiver of rights form.  *Respondents' Exhibit A - Doc. No. 10-1* at 42.  In this second statement, Lynch admitted that he drove to a barn owned by Mr. Douglas Edmondson on April 23, 2008 where he "loaded up a couple of blue pumps" and a "transmission" onto his truck.  *Id*. at 44-45.  Lynch stated that before he exited the property with these items, Edmondson "pulled up [in a red truck] behind my truck."  *Id*. at 44.  At this time, Lynch "asked [Edmondson] who owned this property and he said 'I do.' Then I asked the man if he wanted to get rid of some of the scrap he had up there and he said 'Hell no' and 'that looks like my transmission on the back of your truck."  *Id*. at 45. Lynch advised that he then exchanged words with Edmonson and attempted to drive away with the pumps and transmission on his truck when Edmondson "fired one shot over my truck.  I got out of my truck and told the old man I didn't have his stuff.  I had may hands

2

up and he turned away from me and said come with me.  I then saw he wasn't looking and I grabbed the gun and pushed it into the ground.  I had my finger on the trigger and 5 rounds got fired into the ground, while [I was trying] to get the gun away from the old man. When I finally got the gun away [from him] I put it in the cab of my truck....  The man got in his truck and he rammed my truck causing my door to slam.  I open[ed] the door and got in my truck, as I was trying to leave the man side swiped [my truck] with  his truck." *Id*. Lynch stated that he then left the scene in his truck and after traveling an unknown distance he "threw the transmission off my truck into the woods.  I drove a little further then threw the gun into a creek." *Id*. at 46.  Lynch later led law enforcement officials to the creek where he had disposed of the rifle and officials retrieved the rifle from the creek.

On August 27, 2008, a grand jury for Chambers County, Alabama issued a multiple-count  indictment against Lynch.  The counts contained in the indictment relevant to this case charged Lynch with attempted murder, for which he was convicted of the lesser-included offense of reckless endangerment, first degree robbery and second degree theft of property.  In Count 1 of the indictment, the grand jury charged that "Marvin Dallas Lynch, ... did, with the intent to commit the crime of Murder, attempt to intentionally cause the death of another person, to-wit: Douglas Edmondson, by shooting at him with a .22 rifle, a further description of which is otherwise unknown to the Grand Jury, in violation of Section 13A-6-2 of the Code of Alabama [and] ... [Code] Section 13A-4-2 ..."

3

*Respondents' Exhibit A (Vol. I) - Doc. No. 10-1* at 2.  Count 2 of the indictment charged that "Marvin Dallas Lynch ... did, in the course of committing a theft of property, to-wit: transmission pumps and assorted scrap metal, further descriptions of which are otherwise unknown to the Grand Jury, the property of, Douglas Edmondson, use force or threaten the imminent use of force against the person of Douglas Edmondson ... with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said, Marvin Dallas Lynch was armed with a deadly weapon or dangerous instrument, to wit: a .22 rifle, a further description of which is otherwise unknown to the Grand Jury, in violation of Section 13A-8-41 of the Code of Alabama ..." *Id*.  Finally, Count 3 of the indictment charged that "Marvin Dallas Lynch ... did knowingly obtain or exert unauthorized control over the following property, to wit: one (1) .22 rifle, a further description of which is otherwise unknown to the Grand Jury, the property of, Douglas Edmondson, with the intent to deprive the owner of the said property, in violation of Section 13A-8-4 of the Code of Alabama ..." *Id*.

On September 22, 2008, Lynch executed a "Plea of Not Guilty and Waiver of Arraignment" with respect to the charges lodged against him and acknowledged he had been informed of and received a copy of these charges.  *Respondents' Exhibit A (Vol. I) - Doc. No. 10-1* at 4.  Counsel certified that he "explained to the Defendant his right to be

Arraigned in person and his right to have [counsel] represent him at Arraignment ... [and that the Defendant] hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him/her by me." *Id*. Lynch signed the document certifying that his attorney "explained [to him] each and every matter and right set forth in this form." *Id*.

On October 28, 2008, defense counsel filed a motion to suppress the statements obtained from Lynch. *Exhibit A (Vol. I - Trial Transcript) - Court Doc. No. 10-1* at 9-11. In this motion, counsel argued that "the statements were secured by interrogation after Defendant Lynch had asserted his right to counsel." *Id.* at 11. Counsel sought "an order suppressing [Lynch's incriminating statement] to government agents and further suppressing all fruits derived therefrom." *Id*.

The trial court conducted a suppression hearing on the admissibility of the statements Lynch provided to police. The relevant portion of the suppression hearing transcript provides as follows:

MR. WELDON [The Prosecutor]:

Q. Tony, for the Record, state your named.

A. Tony Ward.

Q. Where are you employed?

A. With the Chambers County Sheriff's Department as an investigator.

Q.  Were you employed there back in April of 2008?

A.  Yes, I was.

Q.  All right.  Did you have an opportunity to get involved in this case concerning Mr. Marvin Dallas Lynch?

A.  Yes, I did.

Q.  All right.  Now, what was your initial involvement in this case?

A.  My initial involvement was responding to the first call put out by dispatch concerning Mr. D. H. [Edmondson] being robbed.

Q.  All right.  Y'all were able to make an arrest and apprehend Mr. Marvin Lynch, correct?

A.  Correct.

Q.  All right.  Now, initially you took Mr. Lynch to the sheriff's department?

A.  To the investigative office at the sheriff's department.

Q.  What was the purpose of this?

A.  To conduct an interview of him.

Q.  All right.  Now, tell me about that interview.

A.  We had Mr. Lynch handcuffed because of the nature of the case.  We took him into the sheriff's department investigative offices.  Investigator Herbert or Sergeant Herbert -- excuse me -- got a "Waiver of Rights" form out, advised Mr. Lynch of his rights.  He acknowledged all of them and stated he was willing to make a statement.  Sergeant Herbert signed it, I witnessed it, and a note was placed on the bottom of it by Sergeant Herbert that Mr. Lynch did not sign it due to being handcuffed.

Q.  Okay and that's the initial Miranda; is that correct?

6

A.  That is correct.

Q.  Now, at the time of this initial Miranda, you went over his rights.  That's your standard Miranda form; is that correct?

A.  Correct.

Q.  That's the document that I've just placed in your hand.  For the purposes of this hearing, we'll call it State's Exhibit 1.  Read that into the record, if you would.

A.  It says "Your rights."  And at the top it has got a place for the name, date of birth, address, social security number and phone number of the defendant, the place where the interview takes place, the date, and the time.

First, line says, "Before we ask you any questions, you must understand your rights.  Number one, you have the right to remain silent.

"Number two, anything you say can and will be used against you in a court of law.

"Number three, you have a right to a lawyer and to have him present with you while you're being questioned.

"Number four, if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.

"Number five, you can decide at any time to exercise these rights and not answer any questions."

The bottom part is "Your Waiver of Rights."  "I have read this statement of my rights or have had them read to me and understand what my rights are.  I am willing to waive these rights and make a statement.  No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me."

Q.  This was the first statement at the investigator's office; is that correct?

A.  Correct.

Q.  All right.  Now, at the time that you went over these Mirandas, did you or anyone in your presence use force or threaten to use force against Mr. Lynch to give a statement?

A.  We did not.

Q.  Did anyone tell Mr. Lynch that it would be better for him to give a statement?

A.  No, we did not.

Q.  At this time anything he said was voluntary?

A.  Correct.

Q.  And you went over the Miranda?  You went over it with him, correct?

A.  Correct.

Q.  Now, you said he did not sign it.  What was the explanation for that?

A.  He was still handcuffed.

Q.  Okay.  Did he acknowledge that he understood his rights?

A.  He did acknowledge he understood them.

Q.  At any point during that initial statement did he ask for an attorney?

A.  No, he did not.

Q.  All right.  Now, tell me about this initial statement.  What did Mr. Lynch tell you?

A.  The only thing he would say during this interview was that he was not up at Mr. D.H.'s property, and that the only reason he ran from the police was because he didn't have any insurance.

Q.  Anything else during that statement?

A.  No, he denied all involvement.

* * *

Q.  There was not a written statement?

8

A. No, there was not a written statement.

* * *

Q. Now, at any time after this initial statement here on April the 23, 2008, did Mr. Lynch express a desire to you a statement?

A. Yes, he did.

Q. Tell me about that.

A. I believe it was May 1st. We served a search warrant to get paint scrapings off the bumper of his vehicle [as there was evidence the perpetrator's vehicle made contact with Mr. Edmondson's truck during the incident at issue]. He was in the custody of the jail. We took him a copy of the paperwork concerning the search warrant. At that time when I handed it to him, he made a comment to the effect that this is very serious. At that point I asked him, I said, Would you like to make another statement? He advised, yes, he would. And at that time I got a waiver form out, and I advised him of his rights again.

Q. Let me show you what has been previously marked as State's Exhibit Number 2. Do you recognize that document?

A. Yes, I do.

Q. What is that document?

A. It is the waiver of rights form that Mr. Lynch was read and signed on May the 1st of 2008.

Q. If you would, just go through that form for the Record, please.

A. Okay, it says, "Place, Chambers County jail. Date, May 1st, 2008. Time, 9:24 hours.
    "Before we ask you any questions, you must understand your rights.
    "You have the right to remain silent.
    "Anything you say can and will be used against you in a court of law.
    "Number three, you have a right to a lawyer and to have him present with you

9

while you're being questioned.

"Number four, if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.

"Number five, you can decide at any time to exercise these rights and not answer any questions."

Bottom part is, "Your waiver of rights."  It says, "I have read this statement of my rights or have had them read to me and understand what my rights are.  I am willing to waive these rights and make a statement.  No promises or threats have been [made] to me, and no pressure or coercion of any kind has been used against me."

Q.  Did he sign that statement?

A.  Yes, sir.  He signed it at the bottom, and he also initialed by one through five acknowledging that he had read over those and understood them.

Q.  All right.

[The May 1, 2008 Waiver of Rights Form initialed and signed by Lynch is admitted for the purpose of the suppression hearing without objection.]

Q.  Tony, now you're down at the jail, and on this date did Mr. Lynch actually give you a statement?

A.  Yes, he did.

Q.  All right.  Now, prior to the time that you took this statement, did you or anyone in your presence use force or threaten the use of force against Marvin Lynch to get the statement?

A.  No, we did not.

Q.  Did you tell him or did anyone in your presence tell Mr. Lynch that it would be better for him to give a statement than not?

A.  No, we did not.

Q.  Was it given voluntarily?

10

A.  It was given voluntarily.

Q.  All right.  Did he have a change to go over his statement once you reduced it to writing?

A.  Yes, he did.

Q.  And did he go over that statement?

A.  Yes, he did.

Q.  I show you something that's marked as State's Exhibit Number 3.  Do you recognize that document?

A.  Yes, I do.

Q.  What is that document?

A.  This is a written statement that I wrote on behalf of Mr. Lynch in reference to our second interview.

Q.  And did he sign that statement?

A.  Yes, sir.  He signed the third page, and he initialed at the beginning and end of the writing on each page.

Q.  Did you give him an opportunity to go over that statement before he signed it?

A.  Yes, I did.

Q.  All right.  And was that his statement?

A.  Yes, it was.

Q.  All right.  Did he ever ask you for an attorney prior to giving you that statement?

A.  No, he did not.

Q.  As far as your knowledge, had he ever asked for an attorney?

A.  To my knowledge, no.

* * *

CROSS-EXAMINATION

MR. DEAN:

Q.  Officer Ward, what was the date of this incident?

A.  I believe it was April the 23rd was the initial date.

Q.  Okay.  And when was that first waiver form that you talked about?  When was that --  When did you first try to obtain the statement from Mr. Lynch?

A.  It was the day that he was taken into custody, which was 4/23/08.

Q.  And then roughly 10 days passed before you went back and saw him?

A.  Yes.

Q.  And that was dated May 1st?

A.  Correct.

Q.  In the second statement where he actually signed the statement, did you write that out?  Or did Mr. Lynch write that out?

A.  I wrote the statement out, and I ... read it back to him when I wrote it out.  And I also gave him a chance after it was completed before signing it to completely read [the] statement and make sure there didn't need to be any changes.  And then that's when he signed it.

        MR. DEAN:  That's all, Judge.

        THE COURT:  All right.  Do you offer the statement?

12

MR. WELDON:  Yes, sir, Your Honor.

THE COURT:  Any objection or challenge?  Just a general objection to it?

MR. DEAN:  Just a general objection based on the possibility that it would infringe on his Fifth Amendment right to not incriminate himself.

THE COURT:  All right.  Based on the testimony, I'm going to admit for the purposes of this hearing State's Exhibit 3.

MR. WHELDON:  Yes, sir.

THE COURT:  All right.  Over defense objection....

* * *

THE COURT:  ...  Just for the Record, the defendant's motion to suppress is denied.

*Respondents' Exhibit A (Vol. I - Trial Transcript) - Court Doc. No. 10-1* at 131-43.

At trial, the State presented testimony regarding the initial exculpatory statement given by Lynch, submitted the written statement provided by Lynch, various photographic evidence, including photographs depicting items taken during the robbery/theft which were located in the bed of Lynch's truck, the rifle retrieved from the creek and a diagram drawn by a witness while on the stand of the area around the barn indicating the location of physical evidence, and presented testimony of the victim, Douglas Edmondson, and law enforcement officials who investigated the case, as evidence in the case.[3]  Mr. Edmondson

---

[3]In introducing the hand-drawn diagram, the State conceded that the diagram was not drawn to scale. *Respondents' Exhibit A (Vol. II - Trial Transcript) - Court Doc. No. 10-1* at 13-14.   Defense counsel objected "because [the drawing] is not to scale.  There are no measurements or anything...."  *Id*. at 14.  The court overruled the objection determining that the scale of the diagram should "go to the weight of it" and, in so doing, noted that the

testified, in relevant part, as follows:

MR. LEWIS [The Prosecutor]:

* * *

Q.  ...  All right.  Tell everybody your name.

A.  Douglas Edmondson.

Q.  Do you have a name or nickname you normally go by?

A.  I go by my initials, D. H. Edmondson.

Q.  Mr. Edmondson, how old are you?

A.  Seventy-two-and-a-half.

Q.  Now, back in April of this year, April 23rd of 2008, how old were you then?

A.  Seventy-two.

Q.  How long have you lived in Chambers County?

A.  Probably 50 years.

Q.  How long have you lived out there on County Road 77?

A.  Thirty years.

Q.  Now, this barn [where the incident occurred], how long have you had that barn?

A.  Probably 25 years, 20 or 25.

Q.  I'll use this term loosely. You retired; is that right?

_____

drawing was not "very complicated" so the fact that it was not to scale would "go to the weight." *Id*. at 14-15

A.  Yes, sir.  I worked 33 years with the electric company.

Q.  What did you do with the electric company?

A.  Everything, collection, lineman.

Q.  Now, after you retired, you still stay busy, don't you?

A.  Yes, sir.  I have a tree service.

Q.  What do you do with your tree service?

A.  I take down trees, got a bucket truck, chippers, grinders.

Q.  Tell me some of the things you've got in the barn,

A.  All the equipment, tractors, trucks, scrap.  Everything that's ever gone bad, I didn't sell it.  It's parked over there.

Q.  You've got hydraulic pumps and stuff like that over there?

A.  That came off the bucket trucks when they go bad.  The old ones is laying there and some good ones.

Q.  I am going to direct your attention to April 23rd, 2008.  You had gone to breakfast that morning; is that right?

A.  Yes, sir.  I eat breakfast at the Coffee Break about 7:30.

Q.  You left the Coffee Break?

A.  And started home.

Q.  You've got to go by your barn going to your house; is that correct?

A.  That's correct.

Q.  About how far is the barn from your house?

15

A.  Oh, quarter of a mile..

Q.  Down across --

A.  Across the hollow.

Q.  Across a couple of hills like that.  Your barn is pretty close to the road, isn't it?

A.  Yes, sir.

Q.  As you went by, tell me the first thing you noticed.

A.  A truck parked partially in the driveway.

Q.  Did you know who that truck was, or did you think you did know?

A.  I thought it was one of my neighbors.

Q.  Not uncommon for your neighbor to be up there?

A.  No, sir.  I've got several that we swap old parts back and forth.

Q.  So what did you do?

A.  I pulled in behind it, stopped, got out.

Q.  Mr. Edmondson, when you pulled in, how did you park in relation to that other vehicle?

A.  I was almost -- well, I would say, five or 10 feet away from it to the left of it, behind it.

Q.  Caddy-cornered?

A.  Sort of up the driveway there.

Q.  So your right front fender was to his left rear fender, right?

16

A. My passenger side fender was to his driver's side back fender, yes, sir.

Q. Now, did you see the defendant at that time?

A. No, sir.

Q. What did you do then?

A. I got out of the truck and walked around front, and then he appeared.

Q. Now, his vehicle is in front of you closer to the barn, right?

A. Yes, sir.                           .

Q. Is he in the middle of the road or kind of off to the side?

A. Off to the side by the scrap pile.

Q. To the right side or left side?

A. Right side, if you go in the driveway.

* * *

Q. Now, what, if anything, did he say?

A. I said something. I don't remember exactly what I said. I said something like -- when he come around, I said something like, are you broke down, lost? I done forgot what I said.

Q. What happened?

A. At that time I seen it was a person I didn't know. And I glanced over at his truck, and one of my shiny aluminum transmissions was laying in the back on top of this other stuff.

And he come on around, and he just grabbed me like this, bear hugged me. We scuffled probably 45, 50 feet down that driveway.

17

Q.  Back behind your vehicle?

A.  That's right....

Q.  Back down the hill towards the road?

A.  Down a river gravel cement driveway.

Q.  What happened at that point, Mr. Edmondson?

A.  He whooped my butt.

Q.  Did you get away from him?  Did he knock you down?

A.  He shoved me backwards.  It liked to have knocked the breath out of me.  And I turned over on my all four's to get up, and he struck me across the back with something.  I don't know what.  I like to blacked out.  The next thing I knew, there was some shots.

Q.  Now, when you got out of your truck, did you leave your door open or close the door?

A.  Left it open.

Q.  Now, that .22 rifle that's in evidence, that's your rifle, right?

A.  Yes.

Q.  Where do you keep that rifle?

A.  Laying on the seat right there by me.  It's my coyote rifle when my cows are calving.

Q.  That's the rifle that you've been carrying in your truck for a long time?

A.  Well, since in the early '70's.  I bought it at Spring Willow Grocery.

Q.  You keep the barrel pointed down, kind of between your seats there?

A.  Laying right on the seat, the barrel pointed at the gear shift.  It's a straight-shift truck.

Q.  Now, you can see it from looking in the window, right?

A.  Yes, sir.  You can see it anywhere.  It's laying in plain view.

Q.  Did you see the defendant with that gun?

A.  No, sir, I did not.

Q.  How many shots did you hear?

A.  I don't know that.  I was scuffling trying to get out of the way.

Q.  Tell me what did you do when you heard the shots.

A.  Gravel flew from where the shots hit the river gravel.  And I went to the passenger side behind my truck.

Q.  Circled back around behind your truck?

A.  No, sir.  I was already behind it.  I just got further over behind my truck.  When he hit me with something, we were 30 or 40 feet down that driveway scuffling.

Q.  Yes, sir.

A.  Before I got back up to the truck, I heard the shots, and I just rolled further out of the way.

Q.  You could feel the gravel from the shots?

A.  Yes, sir.

Q.  At that point, what happened?  Did you see him anymore?

A.  No, sir, I didn't see him.  I heard his truck.  It didn't crank right up.  He hit the starter, and it spun several times and wouldn't crank.  And I knew he had to be in

19

the truck.

So I got up and come around and got to my truck, and his truck cranked.  And he went around that far driveway, and I [drove] straight across and hit [his truck] as he started out the lower driveway of the shop.

* * *

Q.  So you hit him.  You rammed him in the corner?

A.  Yes, sir.

Q.  You hit him in the back of the truck?

A.  I hit him is all I know.

* * *

Q.  Did you give [the defendant] permission to take that scrap iron or those pumps and transmissions from your shop that day?

A.  I had never seen him before.

Q.  Did you give him permission to go in your car and take your gun away?.

A.  No, sir.

Q.  Did you recover any of your property from his vehicle?

A.  Yes, sir.

Q.  What all property did you get out of his vehicle later on that day or the next few days?

A.  It was several days that I went to the jail yard and got it.

Q.  What all did you get?

A.   Got pumps, four-inch angle iron, broke truck axles, differential -- positive

traction differentials for big trucks, and wore out Caterpillar pads off my old D4 and stuff like that, a lot of general junk.  I never did get my transmissions back.

Q.  All that property would be worth money in scrap iron and parts?

A.  Yes, sir.

Q.  At that time scrap was bringing a pretty good price, wasn't it?

A.  Yes, sir.

Q.  Mr. Edmondson, there have been photographs put into evidence that depict injuries on your hands and all, scratch marks and that type of stuff.
        Describe for the ladies and gentlemen of the jury the injuries you got that day.

A.  Well, some way or another, he stomped my right hand.  It swelled double over size for a long time.  And I don't know what -- he hit me across the back with something.

Q.  Did that leave a bruise?

A.  Yes, sir.  It took four or five weeks for it to go away and quit hurting.

Q.  You had injuries to your chest?

A.  Yes, sir.

Q.  Mr. Edmondson, the man that shot at you, the man that hit you, the man that took your property from you by force, the man that went in your vehicle and stole your gun, is he in court today?

A.  Yes, sir.

Q.  Could you point him out for me?

A.  (Witness indicating)

21

MR. LEWIS:  Let the record reflect the victim has pointed out the defendant.

*Respondents' Exhibit A (Vol. II - Trial Transcript) - Court Doc. No. 10-2* at 67-81.

Based on the evidence presented at trial, a duly empaneled jury found Lynch guilty of reckless endangerment, a lesser included offense of attempted murder, first degree robbery and second degree theft of property.  The trial court sentenced Lynch to sentences of twelve months imprisonment for the reckless endangerment conviction, sixty years on the first degree robbery conviction and ten years for the theft of property conviction.  The trial court ordered that these sentences run "concurrent with each other, but they're running consecutively with everything else that he's got."  *Respondents' Exhibit A (Vol. II - Trial Transcript) - Court Doc. No. 10-2* at 40.

Lynch filed a direct appeal of his convictions in which he argued that the trial court erred when it denied the motion to suppress his incriminating statement and all evidence derived therefrom and by allowing into evidence the hand-drawn diagram of the scene which was not drawn to scale.  *Respondents' Exhibit C (Lynch's Brief on Direct Appeal) - Doc. No. 10-4*  at 19-24.  On July 24, 2009, the Alabama Court of Criminal Appeals affirmed Lynch's convictions in an unpublished memorandum opinion.  *Respondents' Exhibit E - Doc. No. 10-6.*  The appellate court's opinion, as is relevant to the claims raised in the instant habeas petition, reads as follows:

The charges against Lynch arose from the following incident.  On the morning of April 23, 2008, 72-year-old D. H. Edmondson drove his truck to

his barn and noticed that a truck was parked partially in the driveway near the barn. Edmondson got out of his truck and saw Lynch, whom he had never seen before, and asked Lynch "are you broke down, lost?" One of Edmondson's new transmissions was in the back of Lynch's truck. Lynch grabbed Edmondson in a "bear hug" and the two men "scuffled" down the driveway. Lynch pushed Edmondson down and struck Edmondson on his back with an object. Lynch removed Edmondson's .22 rifle from the cab of Edmondson's truck and began shooting. Edmondson crawled around to the passenger side of his truck as gunshots striking the road caused gravel to strike him.

Lynch got into his truck, and Edmondson got into his truck. Edmondson rammed his truck into Lynch's truck as Lynch drove down the driveway. After leaving Edmondson's property, but before being apprehended by police, Lynch engaged in a high speed automobile chase with police, followed by a chase on foot.

Motion to Suppress

Before trial, on October 28, 2008, Lynch filed a written motion to suppress statements that were allegedly "secured by [police] interrogation conducted after Defendant Lynch had asserted his right to counsel and to remain silent." Lynch's case was called for trial on November 3, 2008. After the jury was struck, but before the trial commenced, a hearing was conducted on Lynch's motion to suppress. Lynch informed the trial court that he was "challenging whether the statement was voluntary." Investigator Tony Ward was the only witness presented at the hearing. Investigator Ward testified as follows.

On April 23, 2008, Investigator Ward arrested Lynch and took him to the sheriff's department to conduct an interview. Investigator Jon Herbert read Lynch his Miranda rights from a waiver-of-rights form. The waiver-of-rights from was entered into evidence at the suppression hearing and its contents, which advised Lynch of the rights prescribed by Miranda, were read into the record. Investigator Ward testified that Lynch was not coerced in any way to give a statement and that Lynch never requested counsel. According to Investigator Ward, Lynch "acknowledged all of [the rights set forth on the waiver-of-rights form] and stated he was willing to make a

statement." However, Lynch could not sign the waiver-of-rights form because, according to Investigator Ward, Lynch was handcuffed. Investigator Herbert signed the form, apparently to signify that Lynch had been advised of his rights, and Investigator Ward witnessed Investigator Herbert's signature.

> Investigator Ward testified that Lynch stated the following: "[Investigator Ward] A. The only thing [Lynch] would say during this interview was that he was not up at Mr. D. H.'s property, and that the only reason he ran from the police was because he didn't have any insurance.
>
> "[Prosecutor] Q. Anything else during that statement?
>
> "A. No, he denied all involvement."

Investigator Ward also testified during the trial that Lynch told law enforcement that he had not stolen anything. Investigator Ward testified, "We spoke with Mr. Lynch for approximately half an hour. He stuck with the same story...."

Investigator Ward testified that on May 1, 2008, Lynch expressed a desire to give a second statement to law enforcement. Investigator Ward testified,

> "We served a search warrant to get paint scrapings off the bumper of his vehicle. He was in the custody of the jail. We took him a copy of the paperwork concerning the search warrant. At that time when I handed it to him, he made a comment to the effect that this is very serious. At that point I asked him, I said, 'Would you like to make another statement?' He advised, yes, he would. And at that time I got a waiver form out, and I advised him of his rights again."

Investigator Ward testified that a second waiver-of-rights form was explained to Lynch and that Lynch initialed each paragraph on the waiver-of-rights form and singed the bottom of the form to signify that he had been advised of, and understood, his rights. This second waiver-of-rights form

was entered into evidence at the suppression hearing and its contents read into the record. According to Ward, Lynch was not coerced in any way to give a second statement, he did not request an attorney, and he appeared to understand his rights and voluntarily waive them. Investigator Ward reduced Lynch's second statement into a writing, and Lynch reviewed and initialed each page of the writing and signed it to signify that it properly codified his statement. Lynch's second statement was admitted as evidence at the motion to suppress. That statement follows:

"'On the day this happened, I went riding around looking for scrap metal....

"'I was driving towards Wadley on Highway 77 when I saw a barn up a dirt drive. I turned around and pulled up into the drive, got out and rolled up a couple of blue pumps (sic). A man in a red truck pulled up behind my truck. The man who was sitting in his truck -- the man was sitting in his truck and I asked him who owned this property. And he said, I do. Then I asked the man if he wanted to get rid of some of the scrap he had up there. And he said, hell no, and that looks like my transmission on the back of your truck.

"'I had gotten the transmission loaded before the man got there. I told the man that he was crazy as hell, and I'm getting out of here. I got into my truck, and I saw the man standing at the back of my truck holding a rifle. He fired one shot over my truck. I got out of my truck and told the man I didn't have his stuff. I had my hands up, and he turned away from me and said, Come with me. I then saw he wasn't looking, and I grabbed the gun and pushed it into the ground. I had my finger on the trigger, and five rounds got fired into the ground while I tried to get the gun away from the old man.

"'When I finally got the gun away, I put it in the cab of my truck. And the man was laying on the ground. I then motioned for man to get in his truck and back up and get out of the way. The man got in his truck, and he rammed my truck, causing my door to slam. I opened the door and got in my

truck.  As I was trying to leave, the man sideswiped me with his truck.  I spun out, and I think his truck went down into the field.

"'I then got on Highway 77 and headed back towards Lafayette.  And I turned off on the first road to the right.  I then traveled on that road which was the first dirt road to the left. I went a little ways and then threw the transmission off my truck into the woods.  I drove a little further and then threw the gun into a creek.

"'I then went to some guy named Dog and got him to fix my flat tire.  After that I left [from] there and ended back up on Highway 77 headed towards Wadley.  I then got saw [sic] by one of the deputies, and I got scared and ran.  I eventually pulled over, got out of the truck, and ran into the woods where I was later caught by deputies.

"'When I was in the back of the police car, when they opened the door for him to identify me, he, the old man, tried to pull a gun on me.  This was nothing more than a simple case of theft and trespass that went bad when this guy tried to take the law into his own hands.

"'This statement was written for me by Investigator Ward.  I have read it, and it is true and accurate.'"

Lynch objected to the admission of his written statement into evidence at the suppression hearing, stating that he was making "[j]ust a general objection based on the possibility that it would infringe on his Fifth Amendment right to not incriminate himself."  The State offered nothing further at the hearing.  Lynch offered no argument in summation in support of his motion to suppress.  The trial court denied the motion to suppress.

<u>Trial</u>

Essentially, the same testimony was elicited at Lynch's trial. Testimony regarding Lynch's April oral statement [denying any involvement

26

in the incident] was admitted at trial over Lynch's objection: "Your Honor, I object.  And I just want the same objection."  Lynch's May written statement, State's exhibit 3, was admitted into evidence at trial over Lynch's objection:  "Same objection."  Following his conviction, Lynch filed a motion for a new trial; however, the motion did not challenge the admissibility of evidence.  The motion was denied.

Lynch argues on appeal that the trial court erred in denying his motion to suppress his statements to law enforcement because he argues that he made his statements involuntarily.  Specifically, Lynch argues that his statements to police should have been suppressed because Lynch "had [no] prior experience with this sort of situation," "was under tremendous pressure, having been chased down, handcuffed, and taken to jail," and "was not an educated person."

The specific assertions Lynch presents on appeal in support of his claim that his statements should have been suppressed are new assertions raised for the first time on appeal, and thus, they are not preserved for review.  "An issue which is raised for the first time on appeal is not subject to appellate review, because it has not been properly preserved and presented to the trial court."  Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App. 1992); Newsome v. State, 570 So.2d 703, 716 (Ala.Crim.App. 1989) ("Review on appeal is limited to review of questions properly and timely raised at trial."); Goodson v. State, 540 So.2d 789,791 (Ala.Crim.App. 1988), abrogation on other grounds recognized by Craig v. State, 719 So.2d 274 (Ala.Crim.App. 1998) ("In order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court.")  Appellate review is limited to rulings invoked on the trial level.  Burrell v. State, 655 So.2d 45 (Ala.Crim.App. 1992).  This Court will not consider an argument that is raised for the first time on appeal.  Eastland v. State, 677 So.2d 1275 (Ala.Crim.App. 1996).

Moreover, had Lynch's claim been preserved, he would not prevail. Lynch did not present any evidence during the suppression hearing. Therefore, we review the circuit court's denial of the motion to suppress under a de novo standard of review.  See State v. Hill, 690 So.2d 1201 (Ala.

1996). The State had the burden of demonstrating that Lynch knowingly and intelligently waived his right against self-incrimination and his right to counsel. Miranda, supra. In determining whether a defendant's statement is voluntary, the court must determine whether, under the totality of the circumstances, the defendant's will was overborne by a threat or inducement made by law enforcement. McLeod v. State, 718 So.2d 727 (Ala. 1998).

Regarding Lynch's oral April statement, Investigator Ward testified that Lynch was advised of his Miranda rights and indicated that he understood his rights, and said that he wanted to make a statement. According to Investigator Ward, Lynch was not threatened, coerced, or promised anything in order to persuade him to give a statement. Investigator Ward further testified that Lynch did not appear to be under the influence of drugs or alcohol at the time he gave his statement. The trial court's finding that Lynch's [initial statement] was knowingly, voluntarily, and intelligently made was not contrary to the weight of the evidence.

Additionally, the oral statement was exculpatory because, in that statement, Lynch denied any involvement with the [actions] which occurred at Edmondson's property. Therefore, its admission into evidence was not prejudicial.

As to Lynch's May written statement, Investigator Ward testified that Lynch was advised of his Miranda rights and then he executed a waiver of rights form. Investigator Ward testified that Lynch indicated that he understood his rights, [and] said that he wished to make a statement. According to Investigator Ward, Lynch was not threatened, coerced, or promised anything in order to persuade him to give a statement. Investigator Ward further testified that Lynch did not appear to be under the influence of drugs or alcohol at the time he gave his statement. The trial court's finding that Lynch's confession was knowingly, voluntarily, and intelligently made was not contrary to the weight of the evidence.

Based on the undisputed evidence presented during the suppression hearing, the trial court could have reasonably concluded that Lynch voluntarily gave his statements to the Investigators. Accordingly, the trial court's judgment is affirmed.

II.

Lynch contends on appeal that the trial court erred by admitting a diagram drawn by Investigator Ward [while on the witness stand] into evidence.  The diagram reflected the location of shell casings and a cigarette butt found at the scene of the shooting in relation to the barn.  Specifically, Lynch asserted on appeal that the diagram was admitted without a proper foundation, the diagram was not drawn to scale and thus, might mislead the jury, and its admission was unnecessary to communicate what the witness saw.

The following occurred at trial:

"MR. WELDON [Prosecutor]:  State would move to offer State's Exhibit Number 22, this diagram, which actually was drawn here in court.

"THE COURT:  Any objection to State's 22?

"MR. DEAN [Defense Counsel]:  I guess I would object because it is not to scale.  There are no measurements or anything.  I don't want the jury misled by something that is not drawn to scale.

"THE COURT:  Well, I'm going to let that go to the weight of it, Mr. Dean.  I don't see a whole lot of things very complicated about it, so I will let it go to the weight.  Okay?  I understand that it is not to scale.  I will admit State's Exhibit 22."

Initially, we note that Lynch's objection to the admission of the diagram did not include a challenge to the foundation or the necessity of the drawing.  "Review on appeal is limited to review of questions properly and timely raised at trial."  Newsome v. State, 570 So.2d 703, 716 (Ala.Crim.App. 1989).  "[T]he statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not specified at trial."  Click v. State, 695 So.2d 209, 224 (Ala.Crim.App. 1996).  "The purpose of requiring a specific objection to

preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury." Ex parte Works, 640 So.2d 1056, 1058 (Ala. 1994). "A defendant is bound by the grounds of objection raised at trial and cannot change them on appeal." Leonard v. State, 551 So.2d 1143, 1151 (Ala.Crim.App. 1989). Therefore, Lynch did not preserve[] these claims, and they are not properly before this Court for review.

As to Lynch's contention that the diagram was not drawn to scale, and therefore, should not have been admitted into evidence, this Court has held,

"Alabama courts have repeatedly held that the trial court has broad discretion in determining the admissibility of evidence, and that the trial court's determination will not be reversed unless the court has abused its discretion. E.g., Gavin v. State, 891 So.2d 907, 963 (Ala.Crim.App. 2003)."

Yeomans v. State, 898 So.2d 878, 894 (Ala.Crim.App. 2004).

"This court has held that blackboards and charts are admissible in evidence for use in clarification, explanation and for use by counsel in drawing inferences or making calculations based upon matters in evidence. McLaney v. Turner, 267 Ala. 588, 104 So.2d 315 [(1958)]. In ... State v. Crumbley, 27 N.M. 226, 199 P. 110 [(1921)], the witness made a rough sketch in the presence of the jury for the purpose of illustrating his testimony. The admission of the same in evidence was held not error although the witness admitted the sketch was not accurate in some particulars. In Hall v. Sera, 112 Conn. 291, 152 A. 148 [(1930)], a witness while on the stand drew a sketch indicating the relative position of cars as he saw them after a collision. The court explained that the accuracy of the sketch was a proper subject for cross-examination and the fact that it was not drawn to scale and was not an authenticated map of the locality did not render it inadmissible but only affected its weight. An inaccuracy, if it is misleading, is such a distortion as may be, by it[s] very nature, corrected on cross-examination. In the case at bar the

> trial court said, 'The jury can determine what's what.'  The
> trial court obviously did not believe the inaccuracy was
> misleading."

<u>Calhoun v. State</u>, 932 So.2d 923, 951 (Ala.Crim.App. 2005), quoting
<u>Grandquest v. Williams</u>, 135 So.2d 391, 397 (Ala. 1961).

> Here, Investigator Ward admitted that the drawing was not to scale.
> Any inaccuracies in the diagram were to be brought out on cross examination
> and affect the diagram's weight.  Therefore, we cannot say that the trial court
> abused its discretion in admitting the diagram into evidence.

> Therefore, for the reasons given above, Lynch's convictions are due
> to be affirmed.

*Respondents' Exhibit E - Doc. No. 10-6* at 2-11 (citations to record omitted) (footnote

omitted).

Lynch filed an application for rehearing, *Respondents' Exhibit F - Doc. No. 10-7*,

which the Alabama Court of Criminal Appeals denied on August 14, 2009.  Lynch then

filed a petition for writ of certiorari with the Alabama Supreme Court.  *Respondents'*

*Exhibit G - Doc. No. 10-8*.  In his petition for writ of certiorari, Lynch did not seek relief

from the adverse ruling on his claim challenging admission of the hand-drawn diagram.

The Alabama Supreme Court denied the petition for writ of certiorari and the certificate

of judgment issued on May 7, 2010.  *Ex parte Lynch*, 83 So. 3d 589 (Ala. 2010) (Table

Decision).

On August 7, 2010, Lynch filed a state post-conviction petition, pursuant to Rule

32 of the Alabama Rules of Criminal Procedure.[4]  *Respondents' Exhibit H (Rule 32 Petition) - Doc. No. 10-9* at 1-21.  In this post-conviction petition, Lynch argued that trial counsel was ineffective for failing to object to the venire not being administered the qualifying oath prior to voir dire in his case and asserted that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness with respect this omission. *Id*. at 14-16.[5]  Lynch also complained that trial counsel provided ineffective assistance when he failed to object to the District Attorney of Chambers County, Alabama initiating an indictment against him which failed to set forth an appropriate statements of the facts, i.e., the who, what, when, where and how, underlying each offense listed in the indictment. *Id*. at 16-19.  "Simple and very plain the petitioner's indictment fails to state the facts constituting the [charged] offenses....  Absent of identification of the Petitioner's name the indictment does nothing more than recite the statute.  Please pay *close attention that this petitioner does not concern himself with the elements of the offense.  Rather the absence of the facts that suppose to constitute the commission of the offense.*"  *Id*. at 19 (emphasis

---

[4]Lynch advised that he mailed the petition on August 7, 2010.  *Respondents' Exhibit H (Rule 32 Petition) - Doc. No. 10-9* at 12.  As previously noted, a pro se inmate's petition is deemed filed in federal cases the date the petition is delivered to prison officials for mailing.  *Houston*, 487 U.S. at 271-72.  "Alabama courts have [adopted this rule and] held that a pro se incarcerated petitioner/appellant is considered to have 'filed' a Rule 32 petition, a notice of appeal, or a petition for a writ of certiorari when those documents are given to prison officials for mailing." *Ex parte Allen*, 825 So. 2d 271, 272 (Ala. 2002); *Holland v. State*, 621 So. 2d 373, 375 (Ala.Crim.App. 1993) ("[A] pro se incarcerated petitioner 'files' a Rule 32 petition when he hands the petition over to prison authorities for mailing."). Consequently, the prison mailbox rule applies to pro se Rule 32 petitions filed in the state courts of Alabama.  Thus, August 7, 2010 is the appropriate date of filing for Lynch's Rule 32 petition.

[5]Lynch concedes "that ... his petit jury was properly sworn."  *Respondents' Exhibit H (Rule 32 Petition) - Doc. No. 10-9* at 15.  Lynch was represented by different attorneys at trial and on direct appeal.

in original).   Lynch next contends that the District Attorney "had no jurisdiction whatsoever to bound the Circuit Court of Chambers County to conduct a trial in this case" as the proceedings were "based on its illegal drawn indictment." *Id*. at 21.   In support of this claim, Lynch argues "the indictment is devoid of the facts constituting [each] offense, thus the trial Court lacked subject matter jurisdiction to try the Petitioner[] and render judgment or sentence upon the Petitioner." *Id*.

The State filed a response to the Rule petition in which it argued that Lynch "offers no proof of" the claim attacking the jury venire.   *Respondents' Exhibit H (State's Response/Answer to Rule 32 Petition) - Doc. No. 10-9* at 30.  The State further advised that the procedure utilized in Chambers County Circuit Court is to have "the entire venire" which has appeared for a criminal term of court take the oath prior to the venire answering general questions asked by a judge of the court or the striking of a jury for any case set during the scheduled criminal term of court.   *Id*.   The State also argued that the claim challenging "trial counsel's failure to object [to the indictment and an alleged concomitant] lack of jurisdiction is without merit.  It appears that the defendant is arguing that the indictment was improper.  It is not.  It clearly defined the charges against the Defendant." *Id*.

The trial court issued an order on September 10, 2010 dismissing the Rule 32 petition.   *Respondents' Exhibit H - Doc. No. 10-9* at 32.   ("The Court has carefully

33

examined the Petition, specifically Petitioner's grounds and argument therein. The Court finds that the Petition for Relief from Conviction or Sentence Pursuant to Rule 32 is without merit and therefore, said petition is dismissed.").

Lynch filed a motion for reconsideration of the trial court's dismissal of his Rule 32 petition on the ground that he did not receive a copy of the State's response to the petition. *Respondents' Exhibit H - Doc. No. 10-9* at 33-35. The trial court denied this motion on September 27, 2010. *Id.* at 54.

Lynch filed an appeal from the denial of his Rule 32 petition in which he raised the same claims as those presented to the trial court. Lynch also argued that the trial court erred in summarily dismissing his Rule 32 petition absent specific findings of fact on each issue presented for relief and further complained that the State failed to provide him with a copy of their response to the Rule 32 petition thereby depriving him of due process in the Rule 32 proceedings. *Respondents' Exhibit J (Petitioner's Brief on Appeal from Denial of Rule 32 Petition) - Doc. No. 10-*11 at 8-18. On April 22, 2011, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming the trial court's decision to deny Lynch post-conviction relief. *Respondents' Exhibit M - Doc. No. 10-14.* The relevant portion of this opinion reads as follows:

> On August 7, 2010, Lynch filed this, his first, Rule 32 petition wherein he alleged he was denied effective assistance of counsel. Specifically, Lynch asserted trial counsel was ineffective for failing to object to the jury venire not being sworn. Lynch also asserted that trial counsel was

ineffective for failing to object to the indictment charging him with
[attempted murder,] first-degree robbery and second-degree theft of property
because Lynch believes that the indictments failed to contain sufficient facts.
On September 8, 2010, the State filed its response wherein it argued Lynch's
petition was without merit. On September 10, 2010, the circuit court issued
an order dismissing Lynch's petition.

On appeal, Lynch reasserts the claims presented in his petition to the
circuit court and, in addition, contends: (2) the State failed to serve him with
a copy of its response to his petition; and (3) the circuit court erred in failing
to issue specific findings of fact.

## I.

First, Lynch's argument that the circuit court erroneously dismissed
his two ineffective-assistance-of-counsel claims is without merit. To survive
summary dismissal, a Rule 32 petitioner must present the circuit court with
a petition that is meritorious on its face. A Rule 32 petition is "meritorious
on its face" only if it "contain[s] matters and allegations ... which, if true,
entitle the petitioner to relief," Ex parte Boatwright, 471 So.2d 1257, 1258
(Ala. 1985) and if it "contains a ... full disclosure of the [factual basis for the
claim as required under Rule 32.6(b), Ala.R.Crim.P.]." Moore v. State, 502
So.2d 819, 820 (Ala. 1986); Ex parte Clisby, 501 So.2d 483, 486 (Ala.
1986); See also Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App. 2003);
Duncan v. State, 925 So.2d 245, 256 (Ala.Crim.App. 2005).

Regarding the full-fact-pleading requirement contained in Rule
32.6(b), Ala.R.Crim.P., this Court has explained:

> "Rule 32.6(b) [, Ala.R.Crim.P.,] requires that the petition itself
> disclose the facts relied upon in seeking relief. In other words,
> it is not the pleading of a conclusion which, if true, entitles the
> petitioner to relief. It is the allegation of facts in [the] pleading
> which, if true, entitle a petitioner to relief. After facts are
> pleaded, which, if true, entitle the petitioner to relief, the
> petitioner is then entitled to an opportunity, as provided in
> Rule 32.9, Ala.R.Crim.P., to present evidence proving these
> alleged facts."

35

Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App. 2003) (emphasis and internal citations and quotations omitted).   In Hyde v. State, this Court further explained:

> "The burden of pleading under Rule 32.3 [, Ala.R.Crim.P.,] and Rule 32.6(b) [, Ala.R.Crim.P.,] is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and rule 32.6(b).  The full factual basis for the claim must be included in the petition itself.  If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under rjule 32.3 and Rule 32.6(b).

950 So.2d 344, 356 (Ala.Crim.App. 2006) (emphasis omitted).

Rule 32.7(d), Ala.R.Crim.P., permits a circuit court to summarily dismiss a Rule 32 petition for, among other reasons, the preclusion grounds outlined in Rule 32.2, Ala.R.Crim.P.; the petitioner's failure to plead his petition with the factual specificity required under Rule 32.6(b), Ala.R.Crim.P.; the petitioner's failure to raise a material issue of fact or law; or the petitioner's failure to state a claim upon which relief may be granted. In other words, Rule 32.7(d) authorizes circuit courts to summarily dismiss a Rule 32 petition that is not "meritorious on its face."  Cf. Duncan v. State, 925 So.2d at 256.

Lynch's allegation regarding counsel's ineffectiveness was properly dismissed because he failed to meet his burden of pleading pursuant to 32.3 and 32.6(b), Ala.R.Crim.P.   McNabb v. State, 991 So.2d 313, 333 (Ala.Crim.App. 2007) (reaffirming that this Court "may affirm the denial of a Rule 32 petition if the denial is correct for any reason").  Specifically, Lynch failed to allege any facts that, if true, would establish that the outcome of his trial would have been different had counsel insisted that the jury venire be sworn or had counsel challenged the alleged lack of facts contained in Lynch's indictment.  Further, Lynch did not allege any facts that would indicate that any alleged deficiency in the indictment harmed his ability to defend himself.  Accordingly, Lynch failed to meet his burden of full-fact pleading and summary dismissal was appropriate.   Rule 32.6(b),

Ala.R.Crim.P.

Further, the circuit court properly dismissed Lynch's ineffective-assistance-of-counsel claims because Lynch failed to state a claim upon which relief may be granted. Rule 32.7(d), Ala.R.Crim.P. Although Lynch alleged that the jury venire was not sworn, he admitted in this petition that the petit jury was sworn. It is well settled that the failure to administer the oath to the venire does not require reversal if the oath was administered to the petit jury. See Ex parte Benford, 935 So.2d 421, 429 (Ala. 2006). Here, Lynch admits that the petit jury was sworn; therefore, this issue is without merit. Lynch's allegation regarding the sufficiency of the indictment is likewise without merit. This Court has reviewed the indictment charging Lynch and holds that there were no objectionable deficiencies. See Bearden v. State, 825 So.2d 868, 872 (Ala.Crim.App. 2001) (holding that "counsel could not be ineffective for failing to raise a baseless objection"). Accordingly, these claims are without merit and were properly dismissed.

## II.

Next, Lynch argues that his due process rights were violated because the State failed to serve him with its answer to his Rule 32 petition. This Court has recognized that "in some instances, there may be no prejudice when a Rule 32 petitioner is not notified of the State's response." Abdeldayem v. State, 988 So.2d 608, 614 (Ala.Crim.App. 2007). See also Madison v. State, 999 So.2d 561, 567 (Ala.Crim.App. 2006) (holding that the State's failure to serve the petitioner with its motion to dismiss was harmless when the State's motion did not contain an affidavit and the petitioner's claims clearly were not meritorious on their face). Here, the State did not attach any affidavits to its answer, and, as discussed above, Lynch's claims were facially meritless. Therefore, if the State failed to serve Lynch with its answer, any error was harmless. Id.; See also Rule 45, Ala.R.Crim.P.

## III.

Finally, Lynch argues that the circuit court erroneously failed to issue specific findings of fact. Lynch, however, failed to raise this issue in the circuit court. See Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App. 2003) ("The general rules of preservation apply to Rule 32 proceedings.").

Therefore, this issue is not preserved for appellate review and does not entitle Lynch to any relief.

  For the foregoing reasons, the circuit court's judgment is affirmed.

*Respondents' Exhibit M - Doc. No. 10-14 at 2-5.*

  Lynch filed an application for rehearing, *Respondents' Exhibit N - Doc. No. 10-15,* which the appellate court denied. Lynch then filed a petition for writ of certiorari with the Alabama Supreme Court in which he argued that the Alabama Court of Criminal Appeals improperly denied his appeal as he was due relief on his post-conviction claims. *Respondents' Exhibit O - Doc. No. 10-16.* The Alabama Supreme Court denied Lynch's petition for writ of certiorari on August 5, 2011. *Ex parte Lynch*, 123 So.3d 18 (Ala. 2011) (Table Decision).

  Lynch filed the instant federal habeas action on September 16, 2011. In this habeas petition, Lynch asserts the following claims for relief:

> 1. The trial court erred in failing to suppress Petitioner's inculpatory statement and all evidence gained therefrom. *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 5, 22. A confession is not admissible absent a showing that Petitioner knowingly, intelligently and voluntarily waived his rights. *Id*. Petitioner "was under tremendous pressure, having been chased down, handcuffed, and taken to jail. It is apparent ... that [Petitioner] was not an educated person." *Id*. at 23.

> 2. The trial court erred in admitting a hand-drawn

diagram into evidence as the diagram was not drawn to scale. *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 7, 23.

3.   Trial counsel provided ineffective assistance when:  (i) Counsel failed to object to the venire not being administered the qualifying oath before they were subjected to voir dire "to be selected as petit jurors" in his case. *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 8. "[E]ven though his petit jury was properly sworn, [Petitioner] is entitled to have his conviction set aside because the venire was not properly sworn before the voir dire examination [for his case] began." *Id*. at 24; and (ii) Counsel failed to object to the District Attorney charging him with first degree robbery, second degree theft of property and attempted murder (for which he was convicted of the lesser included offense of reckless endangerment) via a deficient indictment thereby depriving the trial court of subject matter jurisdiction as the indictment lacks sufficient facts describing the offenses. *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 25-26.

4.   Appellate counsel provided ineffective assistance "in failing to allege trial counsel's ineffectiveness in ... regard [to lack of an objection to the court's failure to swear the venire]." *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 24.

5.   The "Accusation Against the Petitioner Which is the Indictment" is deficient and deprived the trial court of subject matter jurisdiction due to a lack of sufficient facts set forth therein. *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 17.

39

Specifically, "[t]he indictment is devoid of when; where and how the petitioner['s] alleged conduct toward the victim Douglas Edmondson [constituted first degree robbery, second degree theft of property or attempted murder/reckless endangerment. Except for] identification of the petitioner's name the indictment does nothing more than recite the [applicable] statute." *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 26. "[T]his petitioner does not concern himself with missing elements of the offense. Rather the absence of the facts that suppose to constitute the commission of the offense" is the issue. *Id.* at 27. "[Since] the indictment is devoid of facts constituting the offense, ... the trial court lacked subject matter jurisdiction to try the petitioner and render judgment or sentence upon the petitioner ..." *Id.* at 28.

6. The State failed to serve Petitioner with a copy of its initial response to the Rule 32 petition which hampered his ability to challenge the trial court's order dismissing the petition.

In their answers to the petition, the respondents assert that the claims pending before this court entitle Lynch to no relief. Specifically, the respondents argue that Lynch's challenge to admission of the hand-drawn diagram, the issue regarding suppression of his statement and any independent claim of a deficient indictment depriving the trial court of jurisdiction are procedurally barred from review because Lynch failed to present these claims to the state courts in accordance with the State's procedural rules either at trial, on direct appeal or in the Rule 32 proceedings. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845

(1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including review by the state's court of last resort, even if review in that court is discretionary.); *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003) ("Nothing in *Boerckel's* reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002) ("Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the *Boerckel* rule."); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002); *Holladay v. Haley*, 209 F.3d 1243, 1254 n.9 (11th Cir.), *cert denied*, 531 U.S. 1017 (2000); *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999); *Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992); *Collier v. Jones*, 901 F.2d 770, 773 (11th Cir. 1990).  In order to provide the state courts with the requisite full and fair opportunity to address his claims, "the petitioner [must] 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right.  *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)).  Exhaustion is not satisfied 'merely' if the petitioner presents the state court with 'all the facts necessary to support the claim' or even if a 'somewhat similar state-law claim was made.'  *Kelley v. Sec'y for Dep't of Corr.*, 377

F.3d 1317, 1344 (11th Cir. 2004) (citation omitted)." *Pearson v. Sec'y for Dep't of Corr.*,

273 F. App'x 847, 849-50 (11th Cir. 2008).   As support for their procedural default

argument, the respondents maintain that Lynch's suppression claim is procedurally barred

from review because Lynch did not present this precise claim to the trial court as a basis

for suppressing the statement and the Alabama Court of Criminal Appeals deemed the

claim defaulted on direct appeal for this reason.[6]   In addition, the respondents argue that

the deficient indictment/lack of jurisdiction claim, if raised as a claim separate from the

ineffective assistance of counsel claim, was not presented to the trial court prior to trial nor

did Lynch raise this claim on direct appeal or as an independent claim in the Rule 32

proceedings.[7]   Finally, the respondents assert that Lynch failed to raise the claim regarding

admission of the hand-drawn diagram in his petition for writ of certiorari to the Alabama

Supreme Court during direct appeal.   A review of the petition for writ of certiorari

establishes that Lynch did not raise this claim in such petition.   *See Respondents' Exhibit*

*G - Doc. No. 10-8*.   The respondents therefore argue that these claims are procedurally

barred from review by this court.

---

[6]This assertion is supported by the record.  At the suppression hearing, Lynch presented "a general objection based on the possibility that [the statement] would infringe on his Fifth Amendment right to not incriminate himself." *Respondents' Exhibit A (Vol. I - Trial Transcript) - Court Doc. No. 10-1* at 142.  He repeated this "[s]ame objection" to admission of the statement during trial. *Respondents' Exhibit A (Vol. II - Trial Transcript) - Court Doc. No. 10-2* at 23.  On direct appeal, Lynch argued that the statement was not knowing and voluntary because the circumstances of his arrest and subsequent confinement placed him in a stressful situation and he was uneducated.  *Respondents' Exhibit C - Court Doc. No. 10-4* at 22.

[7]Contrary to the respondents' assertion, it appears to the court that Lynch did fairly present the lack of jurisdiction claim as an independent claim for relief throughout the Rule 32 proceedings.

With respect to the claims Lynch properly exhausted in the state courts, i.e., the claims of ineffective assistance of counsel and his allegation regarding lack of service of the State's answer, the respondents argue Lynch is entitled to no relief from this court as the state courts properly adjudicated these claims on the merits.[8] *Price v. Vincent*, 538 U.S. 634, 638 (2003) ("A habeas petitioner whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)."); *Williams v. Taylor*, 529 U.S. 362, 402 (2000). Moreover, the claim alleging lack of service of the State's response to the Rule 32 petition likewise provides no basis for federal habeas relief as it does not implicate the validity of Lynch's convictions and any relief is also purely an issue of state law.[9] Moreover, the Alabama Court of Criminal Appeals determined that "if the State failed to serve Lynch with its answer, any error was harmless." *Respondents' Exhibit M - Doc. No. 10-14* at 5.

The court provided Lynch an opportunity to file a response to the answers of the respondents. In his response, Lynch argues that he properly exhausted the defective indictment/lack of jurisdiction claim in the Rule 32 proceedings and counsel's failure to raise this issue at trial or on direct appeal establishes cause for any alleged default.

---

[8] It is likewise clear that the state courts, in alternate holdings, also properly adjudicated each of the procedurally defaulted claims.

[9] The response filed by the State to Lynch's Rule 32 petition contains a Certificate of Service in which the Assistant District Attorney certifies "that a copy of the ... Response was served upon the Petitioner, by placing a copy of the same in the United States mail, postage prepaid and properly addressed on the 8th day of September, 2010." *Respondents' Exhibit H - Doc. No. 10-9* at 30.

*Petitioner's Response - Doc. No. 19* at 12.  Lynch further argues that because this "claim

is a <u>subject-matter jurisdictional claim</u>" it is not subject to state procedural default rules as

such a claim "<u>can be challenged at any time</u> [in state proceedings] and <u>jurisdiction once</u>

<u>challenged, cannot be assumed and must be decided</u>."  *Id*. at 24 (internal quotations and

citation omitted).  Lynch further asserts that due to the trial court 's alleged lack of subject-

matter jurisdiction he "is legally ... innocent (i.e. <u>'a fundamental miscarriage of justice</u>.')."

*Id*. at 27.  In addition, Lynch argues that the findings of the Alabama Court of Criminal

Appeals on his ineffective assistance and lack of response claims were contrary to or an

unreasonable application of federal law.  He also alleges that the state appellate court's

decisions on these claims constituted an unreasonable determination of the facts in light

of the evidence presented.

Upon review of the § 2254 petition, the answers of the respondents, Lynch's

response to the answers, the state court record, opinions issued by the state courts and

applicable federal law, this court finds that no evidentiary hearing is required, Rule 8(a),

*Rules Governing Section 2254 Cases in United States District Courts*, and concludes that

the petition is due to be denied.

### III.  DISCUSSION OF CLAIMS[10]

#### A.  Lack of Jurisdiction Due to Deficient Indictment

Lynch argues that the trial court lacked subject matter jurisdiction to render judgment or impose sentence because the indictment failed to allege a sufficient factual basis for each of the charged offenses.  *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 26 ("[T]he petitioner's indictment fails to state the facts constituting the offenses committing robbery 1st degree and theft of property 2nd degree and attempted murder (found guilty of reckless endangerment).  The indictment is devoid of when; where and how the petitioner alleged conduct toward the victim Douglas Edmondson, in commission of the offenses committ[ed] robbery 1st degree and theft of property 2nd degree and attempted murder (found guilty of reckless endangerment).").  This claim is without merit.

A federal district court's review of a claim attacking the sufficiency of an indictment is limited to considering the adequacy of the notice afforded a petitioner through the state procedures.  The Due Process Clause of the Fourteenth Amendment merely requires that whatever charging method the State chooses to employ, it must give the criminal defendant fair notice of the charge against him to permit adequate preparation of his defense.  *Jackson v. Virginia*, 443 U.S. 307, 314 (1979); *Faretta v. California*, 422 U.S. 806, 818

---

[10]In light of the arguments set forth by Lynch addressing the procedural default of his jurisdiction claim and as discussion of the default would entail a determination of prejudice necessitating a determination of the validity of the indictment, the court deems it appropriate to bypass any discussion of procedural default as to the jurisdiction claim and simply address the merits of this issue.

(1975). "The sufficiency of a state indictment is an issue on federal habeas corpus only if the indictment was so deficient that the convicting court was deprived of jurisdiction. *DeBenedictis v. Wainwright*, 674 F.2d 841 (11th Cir. 1982)." *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989); *Branch v. Estelle*, 631 F.2d 1229, 1233 (5th Cir. 1980) ("[T]he sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction."). The indictment issued against Lynch substantially tracked the language of the state statutes defining first degree robbery, *Ala. Code* § 13A-8-41, second degree theft of property, *Ala. Code* § 13A-8-4, and attempted murder, *Ala. Code* § 13A-6-2 and *Ala. Code* § 13A-4-2. The indictment also named Lynch as the perpetrator of the criminal acts, identified Douglas Edmondson as the victim of the offenses, and listed the property taken during the robbery and theft. The court therefore concludes that the indictment sufficiently described the circumstances of each alleged offense. Thus, contrary to Lynch's assertion, the indictment was not fatally defective as it provided him sufficient notice of the charges lodged against him so as to allow preparation of adequate defenses which is all that is required by the Constitution, and, hence, "the state trial court was not deprived of jurisdiction." *Heath*, 863 F.2d at 821.

## B. Adjudication of Claims by the State Courts

The instant petition for federal habeas relief is governed by 28 U.S.C. § 2254, as

amended by the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"]. "A habeas petitioner whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price*, 538 U.S. 634, 638; *Williams*, 529 U.S. 362, 402. Under the requisite provisions of 28 U.S.C. § 2254(d), with respect to a claim adjudicated on the merits in state court, federal habeas relief from a state court judgment may not be granted unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams*, the Supreme Court held:

> Under the "contrary to" clause a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-13.

The Court subsequently explained that habeas relief is appropriate when a petitioner demonstrates "that a decision by a state court is 'contrary to' ... clearly established [Supreme Court] law if it 'applies a rule that contradicts the governing law set forth in [the

47

Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.' *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000)." *Price*, 538 U.S. at 640.  Additionally, federal review in a habeas action "is limited to whether the state court's decision was objectively unreasonable in the light of clearly established federal law. *Williams*, [529 U.S. at 409],120 S.Ct. at 1521." *Hawkins v. Alabama*, 318 F.3d 1302, 1310 (11th Cir. 2003); *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001) (citing *Williams*, *supra*) ("[F]ederal habeas relief [is] available under the 'unreasonable application' standard only if the state court's application of clearly established federal law was 'objectively unreasonable.'"). Thus, a federal court is not to decide "the correctness *per se* ... of the state court decision" but only the "objective reasonableness" of such decision. *Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001).  Moreover, "an ***unreasonable*** application of federal law is different from an ***incorrect*** application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original).  "Clearly established federal law is ***not*** the law of the lower federal courts, including this court.  Instead, in the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.' *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (emphasis in original).

48

It is clear that "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.  529 U.S., at 404-405, 120 S.Ct. 1495.  A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.  *Id.,* at 405-406, 120 S.Ct. 1495.  The [district] court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case.  *Id.,* at 407-408, 120 S.Ct. 1495.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one.  *Id.,* at 409-410, 120 S.Ct. 1495.  See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly')." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227 (11th Cir. 2009) ("A state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts facts that are materially indistinguishable from a relevant Supreme Court

precedent and arrives at a result opposite to the Court's.") (quotation and other marks omitted); *Williams*, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."); *Putman*, 268 F.3d at 1241 ("A state court conducts an 'unreasonable application' of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case.").

Federal district courts are likewise directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  A state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  However, even when the state court addresses a question of law, this court is not authorized "to evaluate [a petitioner's] claim *de novo* rather than through the lens of § 2254(d)."  *Price*, 538 U.S. at 639.  The Supreme Court admonishes that such *de novo* evaluation "exceeds the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)...."  538 U.S. at 636.

As is clear from the foregoing, a federal "district court's review ... [of claims decided by the state courts] is greatly circumscribed and highly deferential to the state courts." *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2007).  The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694.  Additionally, "[t]he usual 'presumption that state courts know and follow the law' is even stronger in the AEDPA context because §2254(d)'s 'highly deferential standard for evaluating state-court rulings ... demands that state-court decisions be given the benefit of the doubt.' *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (internal citation omitted)." *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 748 (11th Cir. 2010).  "In order to merit AEDPA deference the state court need not expressly identify Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument." *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1333 (11th Cir. 2009).  "All that is required under § 2254(d)(1) [for deference to the decision of the state court] is an adjudication on the merits, not a full state court opinion." *Parker v. Sec'y, Dep't of Corr.*, 331 F.3d 764, 776 (11th Cir. 2003).

## 1.  Claims Alleging Ineffective Assistance of Counsel

The Sixth Amendment right to counsel exists to protect the fundamental right to a

fair trial.  The clearly established federal law addressing issues of ineffective assistance of

counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

> To obtain relief under *Strickland*, [Lynch] must show (1) counsel's performance was deficient and (2) that deficiency prejudiced him. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.  Counsel's performance is deficient when it falls "below an objective standard of reasonableness," *Chandler v. United States*, 218 F.3d 1305, 1312 (11th Cir. 2000), which means that it is "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  Further, "omissions are inevitable .... [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler*, 218 F.3d at 1313 (quoting *Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)).  Courts conduct a highly deferential review of counsel's performance and "'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* at 1314 (alteration in original) (quoting *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66).
>
> To establish prejudice, "there must be a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different." *Lynd [v. Terry]*, 470 F.3d [1308, 1315 (11th Cir. 2006)].  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2056.  "A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002).   A petitioner must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067.

*Payne v. Allen*, 539 F.3d 1297, 1315-16 (11th Cir. 2008).  "The proper measure of attorney

performance remains simply reasonableness under prevailing professional norms."

*Strickland*, 466 U.S. at 688; *Hinton v. Alabama*, ---- U.S. ----, ----, 134 S. Ct. 1081, 1088

(2014) (same).  The test used to evaluate claims of ineffective assistance of trial counsel

applies equally to an analysis of claims of ineffective assistance of appellate counsel. *Jackson v. Dugger*, 931 F.2d 712, 715 (11th Cir. 1991). Appellate counsel cannot be deemed ineffective for failing to raise a nonmeritorious claim on appeal. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

    *(i) Lack of Oath to Jury Venire*

Lynch argues that trial counsel provided ineffective assistance when he failed to object to the venire not being administered the qualifying oath prior to voir dire in his case. He also complains that appellate counsel was ineffective because on direct appeal he did not raise a claim of ineffective assistance of trial counsel with respect to this issue. In addressing Lynch's appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals determined that Lynch failed to demonstrate prejudice resulting from this claim of ineffective assistance of counsel because he did not "allege any facts that, if true, would establish that the outcome of his trial would have been different had counsel insisted that the jury venire be sworn.... Although Lynch alleged that the jury venire was not sworn, he admitted in this petition that the petit jury was sworn. It is well settled that the failure to administer the oath to the venire does not require reversal if the oath was

administered to the petit jury.... Here, Lynch admits that the petit jury was sworn; therefore this issue is without merit." *Respondents' Exhibit M - Doc. No. 10-14* at 4.

"[T]here is a difference in a situation in which no oath is given to jurors at all and a situation in which there is merely a defect in the oath." *Ex parte Benford*, 935 So. 2d 421, 429-30 (Ala. 2006). In *Benford*, the court explained that if either the oath to the venire or the oath to the petit jury is given, that is a "defective-oath situation." *Id.* The court distinguished a "defective-oath situation" from a situation in which neither the oath to the venire or the oath to the petit jury is given, which the court identified as a "no-oath-at-all situation." *Id.* The import of distinguishing between these two distinct situations is that a claim based on a "no-oath-at-all situation" is jurisdictional, while a claim arising in a "defective-oath situation" is nonjurisdictional. *Id.* Since Lynch concedes that the trial court administered the oath to the petit jury, this case represents the nonjurisdictional "defective-oath situation" situation.

Lynch presented this claim as one constituting ineffective assistance of counsel, a claim properly analyzed under *Strickland*. Thus, in order to obtain habeas relief, Lynch must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. That is, Lynch "must show that the deficient performance [of counsel] prejudiced his defense. This requires showing that counsel's errors were so serious as to deprive [him] of a fair trial, a

trial whose result is unreliable." *Id*. at 687. In this case, Lynch has failed to make such a showing. For example, Lynch does not allege, much less show, that an unsworn juror somehow impacted the outcome of his trial. *Lott v. State*, 826 So. 2d 457, 459 (1st Dist. Ct. App. 2002) ("The defendant is unable to show prejudice arising from his counsel's silence in the face of the trial court's failure to administer the oath, because, he cannot show that the results of the proceeding would have been different had counsel objected. He does not claim ... that an unsworn juror provided false information and that the defendant would likely have prevailed at trial with a different juror.").

The Alabama Court of Criminal Appeals held that Lynch was entitled to no relief on his claim of ineffective assistance of trial counsel with respect to counsel's failure to object to the venire not being sworn because he did not "establish that the outcome of his trial would have been different had counsel insisted that the jury venire be sworn." *Respondents' Exhibit M - Doc. No. 10-14* at 4. This court has undertaken a thorough review of the opinions issued by the state courts and controlling federal law. After such review, it is clear that the Alabama Court of Criminal Appeals did not decide Lynch's claim "differently than [the Supreme] Court has [in a case based] on a set a of materially indistinguishable facts" nor did the state court apply a rule that contradicts governing federal law. *Williams*, 362 U.S. at 412. Consequently, rejection of this claim by the state court was not contrary to actual Supreme Court decisions or violative of clearly established

federal law.  Moreover, under the circumstances of this case, it is clear that the decision

of the Alabama Court of Criminal Appeals was objectively reasonable and constituted a

reasonable determination of the facts in light of the evidence before the courts.[11]  Lynch

also fails to offer "clear and convincing evidence" to contradict the appellate court's

factual determinations.  28 U.S.C. § 2254(e)(1).  Thus, Lynch is not entitled to federal

habeas relief on his claim attacking trial counsel's failure to object to the trial court not

administering the oath to the jury venire.  In addition, the court finds that because trial

counsel was not ineffective with respect to this claim as no prejudice resulted to Lynch, the

related claim of ineffective assistance of appellate counsel likewise entitles him to no

relief.  *Payne*, 539 F.3d at 1314-15 (where underlying claim of ineffective assistance of

trial counsel is not meritorious, independent claim of ineffective assistance of appellate

counsel provides no basis for habeas relief).

(ii)  *Sufficiency of the Indictment*

Lynch asserts that trial counsel provided ineffective assistance when he failed to

object to the State charging him in an indictment which lacked sufficient facts describing

the offenses.  The Alabama Court of Criminal Appeals determined that Lynch failed to

"establish that the outcome of his trial would have been different ... had counsel challenged

---

[11] "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1260 (11th Cir. 2012).  "To be unreasonable, the error in the state court's finding must be so clear that there is no possibility for fairminded disagreement." *Id*.

the alleged lack of facts contained in [the] indictment.  Further, Lynch did not allege any facts that would indicate that any alleged deficiency in the indictment harmed his ability to defend himself." *Respondents' Exhibit M - Doc. No. 10-14* at 4.  It is likewise clear that this claim of ineffective assistance of counsel is without merit because the indictment provided Lynch sufficient notice of the charges against him and did not deprive him of any constitutionally protected interest.  Consequently, the state appellate court's rejection of this claim of ineffective assistance of counsel was not contrary to actual Supreme Court decisions.  Further, a thorough review of the evidentiary materials submitted in this case establishes that the state court's decision was objectively reasonable and likewise constituted a reasonable determination of the facts in light of the evidence presented by the parties.  Lynch is therefore not entitled to relief from this court on the claim of ineffective assistance of trial counsel arising from the sufficiency of the indictment.

## 2. Claim Alleging Lack of Service of Rule 32 Answer

Lynch asserts that the State failed to provide him a copy of its answer to the Rule 32 petition and argues that the trial court erred in failing to withdraw its order dismissing the petition. *Petition for Writ of Habeas Corpus Relief - Doc. No. 1* at 29.  The Alabama Court of Criminal Appeals deemed any error by the State in failing to serve Lynch "harmless" because "Lynch's [Rule 32] claims were facially meritless." *Respondents' Exhibit M - Doc. No. 10-14* at 5.

Initially, the court notes that this allegation provides no basis for federal habeas relief as it does not implicate the validity of Lynch's convictions or sentences. Moreover, the failure of a state court to require an answer addressing a state post-conviction petition or ensure service on the petitioner of an answer does not implicate the Constitution as states have no obligation to provide this avenue of post-conviction relief, and when they do, nothing in the Constitution requires that a response be filed by the State. *See Murray v. Giarratano*, 492 U.S. 1, 6-8 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Golston v. Attorney Gen. of the State of Ala.*, 947 F.2d 908, 911 (11th Cir. 1991). To the extent Lynch bases this claim on alleged violations of state law, he is likewise entitled to no relief because a state court's interpretation of its own laws and rules provides no basis for federal habeas relief. *Beverly v. Jones*, 854 F.2d 412 (11th Cir. 1988). A federal court has no authority to re-examine state court determinations on questions of state law. *Estelle v. McGuire*, 502 U.S. 62 (1991).

Finally, the record before this court demonstrates that Lynch was not entitled to relief on the claims presented in his Rule 32 petition. He also litigated these claims on appeal from the denial of the Rule 32 petition and suffered no prejudice related to not receiving a copy of the State's answer prior to dismissal of the petition by the trial court. Thus, the decision of the Alabama Court of Criminal Appeals on this issue was not "contrary to" or "an unreasonable application of" clearly established federal law. 28

58

U.S.C. § 2254(d)(1).  Similarly, Lynch does not establish that the state court's decision constituted an unreasonable determination of the facts in light of the evidence presented. After careful review of the record, there is no basis to conclude that the decision of the Alabama Court of Criminal Appeals ran afoul of either 28 U.S.C. § 2254(d)(1) or 28 U.S.C. § 2254(d)(2).  Consequently, Lynch is due no relief with respect to his claim that the trial court erred in summarily dismissing his Rule 32 petition absent his receipt of the State's response.

### B.  Procedurally Defaulted Claims

Lynch alleges that the trial court erred when it failed to suppress his incriminating statement and allowed admission of a hand-drawn diagram into evidence.  These claims for federal habeas relief are procedurally defaulted as Lynch failed to present them to the state courts in accordance with the State's applicable procedural rules.  *O'Sullivan v. Boerckel*, 526 U.S. at 845; *Henderson*, 353 F.3d 880, 891 (11th Cir. 2003); *Pruitt v. Jones*, 348 F.3d at 1358-59.  Specifically, on direct appeal, the Alabama Court of Criminal Appeals found the suppression claim precluded because "[t]he specific assertions Lynch presents on appeal in support of his claim that his statements should have been suppressed are new assertions raised for the first time on appeal, and thus, they are not preserved for review."  *Respondents' Exhibit E - Doc. No. 10-6* at 7; *Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992) (citations omitted) ("Federal review of a petitioner's claim is barred

by the procedural-default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides an adequate and independent state ground for denying relief."); *Parker v. Sec'y Dep't of Corr.*, 331 F.3d 764, 771 (11th Cir. 2003) (quotation marks and citation omitted) (A federal court cannot consider the merits of a claim where "the last state court rendering judgment in the case clearly and expressly state[d] that its judgment rests on a state procedural bar.")  The appellate court further held that "had Lynch's clam been preserved, he would not prevail" as the trial court's findings that each of his statements were "knowingly, voluntarily and intelligently made was not contrary to the weight of the evidence."  *Id.* at 7-8.  After a thorough review of the record, this court likewise finds that the evidence establishes that Lynch's statements were not obtained in violation of his constitutional rights.  With respect to Lynch's claim challenging admission of the diagram, this claim is procedurally defaulted because Lynch did not present it to the Alabama Supreme Court in his petition for writ of certiorari filed on direct appeal.[12]  Thus, the respondents argue that these claims are procedurally barred from review by this court as Lynch did not properly present or completely exhaust these claims in the state courts and no avenue of review remains in the state courts.

    As a prerequisite to filing a federal habeas action, the petitioner must have properly

---

[12]In addition, this claim provides no basis for relief as the trial court did not abuse its discretion in admitting the diagram into evidence.

exhausted state court remedies, either on direct appeal or in a state post-conviction petition, 28 U.S.C. § 2254(b), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)); *Kelley*, 377 F.3d at 1342-44 (11th Cir. 2004) (a petitioner cannot raise claims in federal court if those claims, including the factual basis for the claims, were not first properly exhausted in state court.). To exhaust state remedies in accordance with the exhaustion requirement, the petitioner must fairly present every issue raised in his federal petition to each appropriate state court, including the state's highest court, alerting that court to the federal nature of the claim and a statement of the facts which entitle him to relief. *Duncan*, 513 U.S. at 365-66; *O'Sullivan*, 526 U.S. at 845; *Picard*, 404 U.S. at 277-78. "[F]or purposes of exhausting state remedies, a claim for relief in a habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996); *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) ("In order to be exhausted, a federal claim must be fairly presented to the state courts."); *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000) (the exhaustion requirement is not satisfied when "the ineffective-assistance claim was 'presented' to the state courts [but] not presented in the manner that state law requires.").

It is not sufficient merely that the federal habeas petitioner has been through the state courts, *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made, *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citations omitted). The petitioner must present his claims to the state courts such that they are permitted the "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim." *Picard,* 404 U.S. at 277, 92 S.Ct. at 513 (alteration in original).

Thus, the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief. For example, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts. *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992). As we explained,

> allowing a habeas petitioner to allege a single instance of ineffective assistance in his state post-conviction proceedings and then proceed to federal court to allege additional instances would be contrary to the state's "full and fair opportunity to address the claim on the merits." The state would never have the benefit of evaluating the claim using a fully developed set of facts. This would not be the "serious and meaningful" exhaustion of claims that Congress intended.

*Id.*; *see also Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (en banc) (holding that, where the habeas petitioner properly raised only one ineffective assistance claim on collateral attack in state court, he could seek federal relief based on that specific claim, but not based on other alleged attorney defects that were not presented to the state courts); *Maynard v. Lockhart*, 981 F.2d 981, 984-85 & n. 1 (8th Cir. 1992) ("To preserve an allegation of ineffective assistance for federal habeas review, a petitioner must present that specific allegation to a state court."). Furthermore, habeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way. *See Weeks [v. Jones]*, 26 F.3d [1030] at 1044-46 [(11th Cir. 1994)] (rejecting petitioner's argument that "the general claim of ineffective assistance in state court preserves for federal review all

alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court").  In sum, to preserve a claim of ineffective assistance of counsel for federal review, the habeas petitioner must assert this theory of relief and transparently present the state courts with the specific acts or omissions of his lawyers that resulted in prejudice.  In sum, to preserve a claim of ineffective assistance of counsel for federal review, the habeas petitioner must assert this theory of relief and transparently present the state courts with the specific acts or omissions of his lawyers that resulted in prejudice.

*Kelley*, 377 F.3d at 1343-44.  The court further advised that "[t]o ensure exhaustion, petitioners must present their claims in this manner of clarity throughout 'one complete round of the State's established appellate review process.'  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999).  As long as state supreme court review of a prisoner's claims is part of a state's ordinary appellate review procedure, prisoners of that state must present their claims to the state supreme court to preserve those claims for federal review, even if review by that court is discretionary.  *See id*. at 848-49, 119 S.Ct. at 1734."  *Kelley*, 377 F.3d at 1345.

Lynch failed to properly exhaust his suppression and diagram claims in applicable state court proceedings and no remedy remains before those courts in which Lynch can obtain review of these claims.  The aforementioned claims are therefore procedurally defaulted.  This court may reach the merits of Lynch's procedurally defaulted claims "only in two narrow circumstances.  First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both 'cause' for the default and actual

'prejudice' resulting from the default. *See Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct.

2639, 2644, 91 L.Ed.2d 397 (1986); *[Wainwright v.] Sykes*, 433 U.S. [72,] 87 [(1977)]....

Second, a federal court may also grant a habeas petition on a procedurally defaulted claim,

without a showing of cause or prejudice, to correct a fundamental miscarriage of justice.

*Murray*, 477 U.S. at 495-96, 106 S.Ct. at 2678.   A 'fundamental miscarriage of justice'

occurs in an extraordinary case, where a constitutional violation has resulted in the

conviction of someone who is actually innocent. *Id.*"   *Henderson*, 353 F.3d at 892.

### 1.  **Cause and Prejudice**.

"To establish 'cause' for procedural default, a petitioner must
demonstrate that some objective factor external to the defense impeded the
effort to raise the claim properly in the state court." *Wright v. Hopper*, 169
F.3d 695, 703 (11th Cir.1999).  To establish "prejudice," a petitioner must
show that there is at least a reasonable probability that the result of the
proceeding would have been different. *Id.*; *Crawford v. Head*, 311 F.3d
1288, 1327-28 (11th Cir.2002).

*Henderson*, 353 F.3d at 892.  It is clear to this court that Lynch cannot establish prejudice

resulting from his procedural defaults.  Specifically, even without Lynch's statements and

the hand-drawn diagram, the evidence presented against Lynch was overwhelming.

Consequently, there is no reasonable probability that the result of Lynch's trial would have

been different but for admission of his statements and the hand-drawn diagram.  Inasmuch

as Lynch fails to establish prejudice, this court need not address the cause prong.  *See*

*McCoy v. United States*, 266 F.3d 1245, 1259 (2001) (Because petitioner must establish

both cause and prejudice, the failure to prove either cause or prejudice renders discussion of the other element unnecessary.); *Magee v. Harshbarger*, 16 F.3d 469, 472 (1st Cir. 1994). Based on the foregoing, the court concludes that Lynch has failed to demonstrate prejudice for his failure to present the procedurally defaulted claims to the state courts in compliance with applicable procedural rules.

Moreover, even if Lynch had preserved these claims for federal review, they provide him no basis for relief from this court as the record establishes that the trial court did not act in violation of the Constitution in admitting the statements and hand-drawn diagram into evidence. First, it is undisputed that the jury was aware the diagram was not drawn to scale and, therefore, admission of the drawing was not improper. In addition, after review of the transcript of the suppression hearing, the court concludes that Lynch knowingly, voluntarily and intelligently provided the statements to law enforcement officials.

**2.** **Fundamental Miscarriage of Justice**. Lynch argues that this court should address the merits of his claims to prevent a fundamental miscarriage of justice. The miscarriage of justice standard is directly linked to actual innocence. *Schlup v. Delo*, 513 U.S. 298, 321 (1995). Actual innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id.* at 315. This exception applies where a petitioner

establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Schlup v. Delo*, *supra*. "To establish actual innocence, [a habeas petitioner] must demonstrate that ... 'it is more likely than not that no reasonable juror would have convicted him.' *Schlup v. Delo*, 513 U.S. 298, 327-328, 115 S.Ct. 851, 867-868, 130 L.Ed.2d 808 (1995)." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "[T]he *Schlup* standard is demanding and permits review only in the '"extraordinary"' case." *House v. Bell*, 547 U.S. 518, 538 (2006). Thus, "[i]n the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims." 547 U.S. at 537. "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency. *See Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 2518-2519, 120 L.Ed.2d 269 (1992)." *Bousley*, 523 U.S. at 623-24; *Doe v. Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) ("As *Schlup* makes clear, the issue before [a federal district] court is not legal innocence but factual innocence."). *Schlup* observes that "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.... To be credible, such a claim requires petitioner to support his allegations of constitutional error with ***new reliable evidence*** -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence

are rarely successful."  513 U.S. at 324 (emphasis added).

Lynch asserts that he is "legally innocent" because the trial court lacked subject matter jurisdiction over his case due to alleged deficiencies in the indictment.  *Petitioner's Response - Doc. No. 19* at 27.  The court has previously determined that the indictment properly charged Lynch with each offense set forth therein.  Consequently, the underlying basis for his actual innocence claim lacks merit.  Notwithstanding the foregoing, the fundamental miscarriage of justice exception to procedural default is extremely narrow in scope and concerned with a petitioner's factual innocence as compared to his technical or legal innocence.  *Bousley*, 523 U.S. at 623-624.  Lynch's assertion of actual innocence is based solely on a self-serving and meritless declaration that he is "legally innocent" innocent of the crimes for which he was convicted.  Lynch has failed to make the requisite showing of actual innocence as he has presented no "new reliable evidence" of his factual innocence nor do his allegations suggest that any such evidence exists which could satisfy the stringent standard set forth in *Schlup*.  The procedurally defaulted claims are therefore barred from review by this court.

### IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The petition for habeas corpus relief filed by Marvin Dallas Lynch be DENIED.

2.  This case be DISMISSED with prejudice.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **September 22, 2014**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 8th day of September, 2014.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

68